(Cuyahoga Common Pleas, April Term, 1888.)

## MINNIE E. WHEELOCK v. COMMERCIAL NATIONAL BANK.

*Contracts Based Upon Illegal Transactions—*

1. Where a contract based upon an illegal transaction has been executed the court will not rescind it nor give relief against its terms; and where it is executory it will not enforce it.

*Pari Delicto—Position Unequal—*

2. Where the condition or position of two contracting parties is glaringly unequal, and the mind of one is overborne by the other, they are not on an equality of guilt, and the rule of *pari delicto* will not apply.

*Contract for Suppression of Criminal Proceeding—*

3. A contract based upon suppression of criminal proceedings is illegal and parties entering into it for that purpose are in *pari delicto,* and neither can have relief against the other.

*Rules Applied—*

4. The voluntary execution by plaintiff of a deed of her lands to the holder of paper forged by her husband and father and brother, for the purpose of stifling a criminal prosecution against them, is not duress for which the conveyance will be set aside where it appears that the conveyance was made by procurement of the wife, under advice of counsel and upon due deliberation and without extortion upon the part of the holder of the forged paper.

Judgment reversed by the circuit court, October term, 1890, and judgment of the circuit court reversed by the supreme court and judgment of the common pleas affirmed, 52 Ohio St., 534, unreported, 33 W. L. B., 222.

On December 19, 1883, Minnie E. Wheelock, together with her husband, executed a warranty deed of certain premises on Perry street, in the city of Cleveland, Ohio, to the Commercial National Bank, of Cleveland, Ohio, and subsequently on December 28, 1883, the said deed was delivered to the bank. The bank took possession of the premises on that date, and has ever since been the owner of, and in possession of, the said premises.

On April 8, 1885, nearly two years after the deed was executed, Minnie E. Wheelock filed her petition in the common pleas court. In substance, the allegations of the petition are

that the bank in the fall of 1883 was in possession of about $15,000 of drafts of the Cleveland Chair Company, a corporation of which C. S. Wheelock, the husband of Minnie E. Wheelock, B. J. Wheelock and E. D. Wheelock, the father and brother respectively of C. S. Wheelock, were the officers and managers; that a part of the paper so owned by the bank was claimed to be forged by the three Wheelocks, and that the bank had caused them to be arrested for forgery, and imprisoned until they were released upon bail. This arrest is alleged to have taken place about the middle of October, 1883. That the bank caused publication to be made in the public press of the arrest of the said three Wheelocks, and great pressure was brought to bear upon them and upon the said Minnie E. Wheelock in order to compel her to convey the property mentioned in the petition, so that she was deprived of her free will, and that the title to her property was obtained by the bank without consideration and against her will.

She further alleges that she was under duress at the time she gave this deed, and she sought, in her petition, to have the court decree that the said bank should reconvey to her her title to the property in fee simple, by a short day to be named, and that, in default of such conveyance, the decree of the court operate as such conveyance, and she also sought an accounting of the rents and profits during the time the bank was in possession.

A motion was filed by the defendant, the bank, and a large portion of the allegations of the petition stricken out.

On June 20, 1887, more than two years after the suit was begun the plaintiff filed an amended petition. In her amended petition, she omitted the parts stricken out by the court on motion, from the original petition, but in other respects, the two petitions were substantially the same, although the order in which the allegations were stated in the two petitions was not in all respects alike. After stating, in her amended petition, the facts fully and completely, as claimed by her, and substantially as stated in her original petition, she closed her first cause of action of the amended petition in the following words:

"And she avers that by reason of the matters and things above set forth, said deed was and is null and void, and she insists that the same shall be so treated; and she avers that she is the owner in fee simple of said premises, and has a legal estate therein, and is entitled to the possession thereof."

In a second cause of action in her amended petition, she alleges that the bank has retained possession of the premises and received the rents and profits thereof, and that she believed

that they amounted to $500 per year over and above the taxes paid on the premises.

The prayer to the amended petition was in the following words:

"The plaintiff asks for judgment against the defendant for possession of said premises, and for the amount of said rents and profits, and the interest thereon from the time the same were so received."

The bank answered the amended petition, stating in substance that the Cleveland Chair Company, in the fall of 1883, failed in business, being indebted to the bank in the sum of about $15,000 as the result of the discount by the bank for the chair company of drafts drawn on various parties by the chair company; that the acceptances on a large part of the drafts that were discounted were forged by the three Wheelocks, who were the managers, officers and stockholders of the chair company; that upon the discovery of the forgery, the officers of the bank placed some of the forged paper in the hands of the county prosecutor of Cuyahoga county, Ohio, who presented the evidence to the grand jury, who returned an indictment against the three Wheelocks for forgery; that J. E. Ingersoll, an attorney at law, representing the Wheelocks, offered to pay the debt to the bank by a conveyance to the bank of the property described in plaintiff's petition, together with some other property; that the bank accepted Ingersoll's proposition, and received the conveyance mentioned in the plaintiff's petition, and surrendered up to Ingersoll all the notes and drafts held by the bank, both those forged and those that were genuine.

The answer also alleged that the three Wheelocks admitted to the bank that they were guilty of the crime of forging said acceptances.

A reply was filed to this answer in which the guilt of the three Wheelocks is not denied.

Before the case came to trial, a motion was made by Minnie E. Wheelock, to have the case assigned for trial by jury. This motion was overruled, and the case was assigned to be tried by the court, without a jury. At the time of the trial, the application for a jury trial being renewed, was denied by the court, and the case was tried to the court without a jury.

The evidence presented by the plaintiff in substance disclosed that in October, 1883, there was an indebtedness of the chair company to the bank of about $15,000; that B. J. Wheelock, E. D. Wheelock and C. S. Wheelock were the stockholders and officers, and had the entire ownership and control of the chair company.

That the chair company failed about this time and on investigation, it was found that the three Wheelocks had, for several years, been carrying on a system of fraud, it being their

custom to draw a bill of exchange payable by some fictitious person to themselves, and accept the bill in such fictitious name. These drafts were made for odd amounts, as if in payment for invoices of goods, and were discounted at the bank as if genuine business paper. When these bills became due, it was the custom of the Wheelocks to forward money to pay them to the bank where they were made payable, obtaining funds for the purpose of such remittance, by discounting other forged paper with the bank. After the failure of the chair company and the discovery of the fraud, the bank presented some of this paper to the prosecuting attorney of the county, who fully investigated the facts, and the three Wheelocks were indicted by the grand jury for forgery on October 13, 1883, and immediately thereafter arrested. Immediately after the arrest, every possible effort was made by the Wheelocks, and their relatives and their friends, and Judge Ingersoll, their attorney, to escape the consequences of their crime. Judge Ingersoll stated to the president of the bank, shortly after the arrest, that he had advised his clients that it was an honest debt, and that it should be paid. The guilt of the Wheelocks was not denied in the pleadings and was clearly shown on the trial.

The plaintiff, Minnie E. Wheelock, testified that she called upon the president of the bank at his residence, and that he told her there that if the debt was paid, the prosecution would be stopped, but if the debt was not paid, the prosecution would go on. About a month after this interview between the plaintiff and the president of the bank, to-wit, on November 15, 1883, the plaintiff's father conveyed to her the house and lot on Perry street, which she in turn, more than a month afterwards, conveyed to the bank, the deed therefor being drawn by Mr. Prentiss, her attorney in this case, and acknowledged before his partner, Mr. Vorce. On December 28, 1883, Judge Ingersoll having arranged a settlement of the debt to the bank delivered the deed, with certain other securities, to the bank in payment of said debt and the bank delivered up to Judge Ingersoll all the evidences of debt of the chair company, both the drafts which were forged, and the drafts which were genuine.

Subsequently, at the request of Judge Ingersoll, the vice-president of the bank wrote a letter to the prosecuting attorney, in which he stated that the bank would prefer that the prosecution should not be pressed, and the prosecution was thereafter nolled.

Immediately thereafter, the plaintiff and her husband left the city of Cleveland, and made no objection to the conveyance until the bringing of this suit, which was about two years after the delivery of the deed.

The plaintiff stated on the trial that her only object in executing this deed to the bank was to save her husband from imprisonment.

At the termination of the plaintiff's evidence, a motion was made by defendant to dismiss the case on the ground that the plaintiff showed an executed contract made for an illegal purpose. On the hearing of this motion, the plaintiff admitted that this contract was for an illegal purpose and was executed, but claimed that it was made under duress, and that consequently, the rule of *pari delicto* did not apply.

The court of common pleas granted the motion and dismissed the case.

NOBLE, J.

The object of this suit is to set aside a deed obtained, as is alleged, by duress, that duress being a criminal prosecution against the plaintiff's husband, her father in law and brother in law, in the first place instituted or thereafter made use of by the bank to obtain the deed. As to the principles of law governing such cases, our supreme court has held: that where a contract based upon an illegal transaction has been executed the court will not rescind it or give relief against its terms, and that where it is executory it will not enforce it.

It is further well settled that a contract based upon the suppression of criminal proceedings is illegal, and that parties to it entering into it for that purpose are *in pari delicto,* and neither can have relief against the other.

For the purposes of this motion as the court, looks at the testimony, it may also be conceded, as claimed by the plaintiff, that where the condition or the position of the two contracting parties is glaringly unequal, and the mind of one is overborne by the other, they are not on an equality of guilt, and the rule of *pari delicto* will not apply, and the weak will be protected against the strong and the wrong done made right.

It is also settled that the effect of unlawful duress is to vitiate all contracts it enters into unless in some way the effect is afterwards waived. As to imprisonment being duress, it has expressly been held by our supreme court that to constitute such duress as will avoid a contract, it must be unlawful, that the party was innocent of the crime charged.

The testimony on the part of the plaintiff shows an admitted forgery by plaintiff's husband, and father and brother, whereby the bank was the loser to the amount of about ten thousand dollars; an indictment against all three was found by the grand jury of this coun-

ty; the information which led to it being first communicated to the prosecuting attorney by one of the officers of the bank; an interview solicited by Judge Ingersoll between the president of the bank and himself, he representing at first E. D. Wheelock, and subsequently the plaintiff's husband and B. J. Wheelock as well, in which the president of the bank expressly says to him in the outset that they cannot make any agreement whereby the criminal proceedings will be suppressed, and wherein Judge Ingersoll expressly says that his talk in no way relates to that; that he had told his clients it was an honest debt and should be paid; that he had been employed to look after their interests in a criminal prosecution, and that the first thing to do was to pay up the bank; that he had a great many interviews with the bank officers in regard to it, and that as a final result the debt, amounting to $15,0000, about $10,000 of which was forged paper, was paid in part and the balance secured, a part of the payment being the deed in controversy, and that after this was accomplished, the evidences of debt, including the forged paper, were delivered to him, and that at his request a note was written by the cashier to the prosecuting attorney saying that they would prefer that the criminal proceedings be stopped. In the meantime, soon after the arrest, which was October 13, 1883, the plaintiff called upon Mr. Eells, the president of the bank, at his house, and she states that she asked him if the debt was paid whether the criminal prosecutions would proceed, to which he replied "no." That she then asked him if it was not paid whether they would proceed, to which he replied, "yes." She testifies that this was repeated; she testifies further that she subsequently made the deed solely to save her husband from his possible imprisonment under the criminal prosecution and for no other reason.

Miss Winters testifies to seeing the plaintiff subsequently, and that she was very much agitated, and that she did not think her capable of transacting business, identifying particularly one night when she said Mrs. Wheelock told her her husband had gone to see her father in regard to doing something to relieve him from the criminal prosecution; that her agitation was great and that some other woman would not have been affected so much and that she feared the result of the prosecution.

B. J. Wheelock testifies to certain talks with Mr. Eells, looking to a dismissal of the criminal prosecutions, and that these talks were all with that end in view.

T. D. Wheelock testified that on one occasion Mr. Eells said "you are not going to stand trial are you?" The evidence all goes to show, in the opinion of the court, that the only pur-

pose on the part of Mrs. Wheelock and of her husband and father in law and brother in law, in all that was done by each and all of them was to stifle their criminal prosecution, and it is fairly inferable from the testimony that the bank was willing to stifle it, provided it got its money. The advances are all made by the Wheelocks or their attorney; the propositions are all made by them. Now, was that a lawful purpose or not? Certainly not. The end sought was accomplished. Was it by their procurement as well as by that of the bank? It seems to the court that there can be but one answer, that it was. Whether it was accomplished by the aid and concurrence of the bank or not, can make no difference.

How can the effect of Mrs. Wheelock's plain statement that the only purpose of making the deed was to save her husband from the possible imprisonment under the criminal proceedings—how can that, I say, be overcome? The effect of that statement must be, under the law, to give her no relief, but to leave her where she has placed herself, unless at the time when she made the deed her understanding and mind was so unbalanced and overreached by acts directly attributable to the bank, and done by the bank with the express purpose of overreaching and overdrawing and terrorizing her, and thus take the actions out of the operation of the rule *pari delicto*. If such were the facts they might, perhaps, under some of the decisions, amount to duress and would avoid her act. It cannot be claimed that there is any testimony tending to show that the purpose of the bank in instituting these proceedings was for the purpose of extorting the settlement. It is claimed, however, that after they were instituted the bank used them for that purpose. If immediately upon her interview with Mr. Eells, or within a short time thereafter, and with his declarations that if the debt was not paid the prosecution would go on, she had executed and delivered this deed, the court would strongly incline to believe that such a declaration on his part had the effect claimed for it to a great extent; but the testimony shows that this interview was shortly after the arrest, which was October 13, when she had no property to convey The deed to her from her father was November 15, about a month probably after; and although there is no testimony as to the date of the deed from her to the bank, there is testimony showing that Judge Ingersoll delivered this deed to the bank about the middle of December, fully a month after she received title to the property and about two months after the interview with Mr. Eells. Now what was being done in the meantime? She says she consulted with no one about making this deed. It is contrary

to all human experience that a wife, under the circumstances named, should have no knowledge of or consultation in regard to the progress of events from the time of the interview with Mr. Eells in October up to the middle of December. B. J. Wheelock knew about the contemplated conveyance and talked with Mr. Eells about it. E. D. Wheelock knew about it and talked with Mr. Eells, and Judge Ingersoll knew about it and canvassed the making of it and the value of the property conveyed by it frequently with the bank officers; appraisers were appointed to view it and viewed it, and it is idle to say that the subject of the transfer was not talked about by the family fully together, and that they consulted freely and fully together, she with the rest, and although there is no evidence of the proper rxecution of the deed by her, an inference is fairly to be drawn that it was properly executed and acknowledged before the proper officers, from the fact of its delivery by Judge Ingersoll and its acceptance by the bank. True, she may not have consulted counsel, strictly so speaking, but she was in daily intercourse with those for whom she mace the deed, who were consulting counsel, and she must have understood the full effect and import of her act; her husband had employed as good counsel as could be had in the city, her father was a man of age and experience, her connections, as given by her to Mr. Eells, were among the best; the court cannot believe that she acted unadvisedly and without proper counsel. If she had acted hastily, without time or opportunity for deliberation, in the absence of advice, and without time or opportunity to obtain it, the court would be inclined to take a different view of it. I have no doubt but this wife was sorely affected by the arrest and indictment of her husband, and that fear and apprehension for his safety filled her heart. But can the court say that this was caused by the act of the bank, or by the fact of his guilt and possibly imprisonment, such as would naturally follow with any wife who loved her husband? Too much time elapsed between the interview, claimed to have accomplished this duress, and the delivery of this deed to warrant the court in giving it the effect claimed. In all the cases cited by learned counsel we find no such interval of time elapsing between the duress and the execution of the contract. Then, too, there are certain inferences which a court cannot help drawing from the fact of the two years delay in beginning this suit.

We have no word of testimony in regard to it, no word of explanation. It is har'ly necessary, however, to comment upon this. These being my views upon the testimony and the law of the case, and regardless of any sympathy the court may have, as an individual, for this woman, I sustain the motion to dismiss.

*Jas. H. Hoyt, A. St. J. Newberry,* and *A. C. Dustin* for Plaintiff in Error.

*Prentiss* and *Vorce,* for Defendant in Error.

NOTE. *Prentiss* and *Vorce, James H. Hoyt, A. St. J. Newberry,* and *A. C. Dustin,* for Plaintiff in Error cited: *Roll* v. *Raguet,* 4 Ohio ,400, 420; *Goudy* v. *Gebhart,* 1 Ohio St., 262; *Hooker* v. *DePalos* 28 Ohio St., 251; *Kahn* v. *Walton,* 46 Ohio St., 195; 8 Am. and Eng. Ency. Law, 649; 5 Am. and Eng. Ency. Law, 430; 3 Am. Eng. Ency. Law, p. 933; *Terrill* v. *Achawer,* 14 Ohio St., 80, 85; *Allis* v. *Billings,* 6 Metcalf, 417; *Anderson* v. *Roberts,* 18 J. R., p. 529; Story on Contracts, sec. 405; Devlin on Deeds, par. 81; *Knapp* v. *Thomas,* 39 Ohio St., 377, 388; *Reece* v *.Allen,* 5 Gilman, (Ill.), 241; *Frauchet* v. *Leach,* 5 Cowen, 508; *Williams* v. *Mears,* 2 Disn., 608; Bigelow on Fraud, vol. 1(Ed. of 1888), p. 73; *George* v. *Tate,* 102 U. S., 564, 570; *Hartshorn,* v. *Day,* 60 U. S. (19 Howard), 223; *Strong* v. *Strong,* 102 N. Y., 69; *Bowen* v. *Mandeville,* 95 N. Y., 237; *Moller* v. *Tuskey,* 87 N. Y., 166; Benj. on Sales, secs. 648, et al.; *Doane* v. *Lockwood,* 115 Ill., 490; *Brewer* v. *Goodyear et al.* 88 Ind., 572; *Talcott* v. *Henderson,* 31 Ohio St., 162; secs. 4198 and 4106, Rev. Stat.,; *Lindsley* v. *Coats,* 1 Ohio 243, 245; *Baldwin* v. *Bank,* 1 Ohio St., 142, 148; *Spangler* v. *Dukes,* 39 Ohio St., 642; *Starr* v. *Starr,* 1 Ohio, 321, 327; Bigelow on Fraud, pp. 76-77; *Starr* v. *Starr,* 1 Ohio, 321, 327; *Spangler* v. *Dukes,* 39 Ohio St., 642; *Truman* v. *Lore,* 14 Ohio St., 144; *Knapp* v. *Thomas,* 39 Ohio St., 377, 388; *Walker* v. *Kynett* 32 Iowa, 524; *Feret* v. *Hill,* 15 C. B., 207; *Hartshorn* v. *Day,* 60 U. S. (19 How.), 223; *Williams* v. *Mears* 2 Disn., 604; 8 Am. and Eng. Ency. Law, p. 651; *In re Dixson,* v. *Caldwell,* 15 Ohio St., 412, 415; Pomeroy's Remedies and Remedial Rights, sec. 68; *Hager* v. *Reed,* 11 Ohio St., 626, 635; *Klone* v. *Bradstreet,* 7 Ohio St., 323-326; *Rankin* v. *Hannan* 37 Ohio St., 113, 118; 6 Am. Eng. Ency. Law, p. 245; *Wallace* v. *Seymour & Rennick,* 7 Ohio, 158; *Truman* v. *Lore,* 14 Ohio St., 144; *Walker* v. *Kynett,* 32 Iowa, 526; *Spencer* v. *Marckel,* 2 Ohio, 263, 264; *Smith's Lessee* v. *Hunt,* 13 Ohio, 260, 268; 2 Yaple Code Practice and Precedents, p. 1; *Rowe* v. *Beckett* 30 Ind., 154; *Groves* v. *Marks,* 32 Ind., 319; *Peck, Tr., etc.,* v. *Newton,* 46 Barbour, 173; *Lombard* v. *Cowham,* 34 Wis., 486; *Clark* v. *Lockwood,* 21 Cal., 222; *Emeric* v. *Penniman,* 26 Cal., 119; *Kahn* v. *Oid Telegraph Mining Co.,* 2 Utah, 195; *Gibson* v. *Chouteau,* 80 U. S. (13 Wall.), 103; *Goepinger* v. *Ringland* 62 Iowa, 76; Kerr on Fraud and Mistake, pp. 44-50; *Rowland* v. *Entrekin,* 27 Ohio St., 47, 49; *Admr. of John Reed* v. *Reed,* 25 Ohio St., 422; *Ivinson* v. *Hutton,* 98 U. S., 79; *Reid* v. *Burns,* 13 Ohio St., 49, 59; *Rowland* v. *Entrekin,* 27 Ohio St., 47; *Massie* v. *Stradford,* 17 Ohio St., 597; *Buckner* v. *Mear,* 26 Ohio St., 514; *Rankins* v. *Hannan* 37 Ohio St., 113; *Sheeful* v.

*Murty,* 30 Ohio St., 50; *Dodsworth* v. *Hopple* 33 Ohio St., 16; *Truman* v. *Lore,* 14 Ohio St., 144; *Kent's Commentaries,* vol. 2 13th Ed., p. 234; *Tyler on Infancy,* p. 43, et seq.; also pp. 51-2; also p. 70; Story's Equity Jurisprudence, 13th Ed., vol. 1, sec. 24; *Mc Veigh* v. *Ritenour,* 40 Ohio St., 107; *Corry* v. *Gaynor,* 21 Ohio St., 277, 280; *Reed's Administrator* v. *Reed,* 25 Ohio St., 424; *Moore* v. *Chittenden,* 39 Ohio St., 563; *Moore* v. *Adams,* 8 Ohio, 373, 375; *Herbst* v. *Manss,* 4 W. L. B., 1058; *Roll* v. *Raguet,* 4 Ohio, 400, 420; *Goudy* v. *Gebhardt,* 1 Ohio St., 262; *Hooker* v. *DePalos* 28 Ohio St., 251; *Kahn* v. *Walton,* 46 Ohio St., 195; *Moore* v. *Adams,* 8 Ohio, 373; *Haines* v. *Rudd,* 102 N. Y., 372; *Smith* v. *Rowley,* 66 Barb., 502; *Watkins* v. *Baird* 4 Am. Dec., 17ʋ; *Meek* v. *Atkinson,* 19 Am. Dec., 653; *Hatter* v. *Greenlee,* 26 Am. Dec., 370; Devlin on Deeds, pp. 81-82; *Yeoman* v. *Lasley,* 40 Ohio St., 190; *Baldwin* v. *Snowden,* 11 Ohio St., 203.

*Prentiss & Vorce* for Defendant in Error, cited: 8 Am. and Eng. Law, 649; *Gunsaullus* v. *Pettit,* 46 Ohio St., 27; Stat. sec. 5130; *Calvino* v. *State,* 12 Ohio St., 60, 72; Ad. Cont., 732 (bottom page); Chitty on Cont., 597 (Ed. of 1851); *U. S.* v. *Grossmayer* 76 U. S. (9 Wall.), 72; 19 Am. Dec., 71; *Terrill* v. *Achauer,* 14 Ohio St., 80, 85; 44 Pa. St., 12-3; 2 Pet. Sup. Ct., 539; 2 Story E. J. sec. 695; 1 Story, E. J., sec. 298; *Cox* v. *Donnelly,* 34 Ark., 766; *Burgett* v. *Burgett,* 1 Ohio, 469; Anderson's Dic. of Law, 387; Story Cont., sec 394; 3 N. H., 508,511; 5 Hill, 158; 74 U.S. (7 Wall.) 215; Whar. Cont., sec. 151; Bishop Cont., sec. 721; 26 Barb., 122; 6 Wis., 54, and 14 Cox's Crim. L., Ca. 617-8, 623; *Fribley* v. *State,* 42 Ohio St., 205; 18 John, 515; *Nash* v. *Atherton* 10 Ohio, 163; *Webb's Admr.* v. *Roff,* 9 Ohio St., 430-4; *McVeigh* v. *Ritenour,* 40 Ohio St., 107-8, *Truman* v. *Lore,* 14 Ohio St., 144; p. 155 (near the top of the page); *Williams* v. *Mears,* 2 Disn., 604, 608; 17 New York, 270; 13 Mass., 177-8; 5 Allen, 59-60; 7 Cush., 181-183; 92 Pa. St., 171; 100 Pa. St., 51-52; 56 Ill., 25, 27; 77 Ala., 290; 57 Wis., 288-289, 290-291; *Ellis* v. *Davis,* 109 U. S., 485; *Dick* v. *Railroad Co.,* 38 Ohio St., 389; Dev. on Deeds, sec. 83; *Blair* v. *Coffman,* 5 Am. Dec., 659; 26 Am. Dec., 376, note; 14 New York, 123; 11 Mass., 379; 13 Mass., 371; *Truman* v, *Lore,* 14 Ohio St., 144, 151; 3 Am. and Eng. Law, 933, note 2; 17 Am. and Eng. Law, 406; 22 Pick., 181; *Hooker* v. *DePalos,* 28 Ohio St., 251, 260; 107 N. Y., 111; 102 N. Y., 272, 26 N. Y., 12 14 R. I., 618-620; 131 Mass., 51, 55; *Bailey* v. *Williams,* 4 Gifford, 638, 645; 1 Law Rep. E. & I., App. 200; Law Reports, 8 Ch. Div., 473-474, 477; 11 Vermont, 252; 13 Ves. Jr., 581; 151 Pa. St., 594.