FRANCES E. MEECH v. FRED E. LEE AND WILLIAM G. HOWARD, EXECUTORS OF PHILO D. BECKWITH, DECEASED.[1]

*Mortgage—Duress—Compounding felony—Equity.*

1. In this case the execution of a mortgage by a mother, she being moved to so execute it by the belief that she would thereby save her son from a threatened criminal prosecution, is held to have been under undue pressure, and not as the free and voluntary act of the mortgagor, and that a second mortgage executed by her is affected by the original transaction.

2. A mortgage given in consummation of a settlement, the object of which is to stifle a criminal prosecution, is voidable as against public policy.

3. "In cases where agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not, in equity, material. The reason is that the public interest requires that relief should be given, and it is given to the public through the party;" citing 1 Story, Eq. Jur. § 298; 2 Pom. Eq. Jur. §§ 941, 942.

4. Courts of equity grant relief in many cases where there is no *legal* duress, in the strict acceptation of the term, and where the wronged party would perhaps be remediless at the common law; citing 2 Pom. Eq. Jur. § 951; 1 Story, Eq. Jur. § 239; *Harris v. Carmody*, 131 Mass. 51; *Foley v. Greene*, 14 R. I. 618; *Williams v. Bayley*, L. R. 1 H. L. 200; *Coffman v. Bank*, 5 Lea, 232.

[1] In pursuance of an order of the Court entered January 7, 1891, the portion of the opinion devoted to a review of the testimony is omitted in the publication of this case.—REPORTER.

5. Where testimony is taken in open court in a chancery suit, the circuit judge has no authority to absolutely reject testimony, unless of a nature so scandalous as not to be proper to appear in the record of the proceedings. If testimony is forced into a case which is evidently irrelevant and immaterial, a motion may be made to expunge it, and the court may order it expunged, with costs against the solicitor insisting upon its being taken; but it must be returned on appeal, in order that the appellate court may pass upon the correctness of the ruling.[1]

Appeal from Berrien. (O'Hara, J.) Argued July 2, 1890. Decided August 1, 1890.

Bill to set aside certain mortgages. Complainant appeals. Relief prayed for granted. The facts are stated in the opinion.

*N. A. Hamilton*, for complainant, contended:

1. In answer to claim that complainant is not entitled to relief because she is a party to compounding a felony, counsel cited *Feller v. Green*, 26 Mich. 70; *Seiber v. Price*, Id. 518; *Snyder v. Willey*, 33 Id. 483; *Lyon v. Waldo*, 36 Id. 347; *Wisner v. Bardwell*, 38 Id. 278; *Vyne v. Glenn*, 41 Id. 112; *Fosdick v. Van Arsdale*, 74 Id. 302; *Foley v. Greene*, 14 R. I. 618; *Coffman v. Bank*, 5 Lea, 232; *Harris v. Carmody*, 131 Mass. 51.

*Spafford Tryon*, for defendants, contended:

1. Admitting complainant's evidence to be true, it fails to show that the mortgage was given under duress; citing *Ins. Co. v. Meeker*, 85 N. Y. 614; *Haynes v. Rudd*, 102 Id. 372; *Knapp v. Hyde*, 60 Barb. 80; *Davis v. Luster*, 64 Mo. 43; *Mundy v. Whittemore*, 15 Neb. 647.

2. Threats of a lawful imprisonment or prosecution do not constitute duress or undue influence; citing *Rood v. Winslow*, 2 Doug. 68; *Gates v. Shutts*, 7 Mich. 127; *Rexford v. Rexford*, 7 Lans. 6; *Eadie v. Slimmon*, 26 N. Y. 9; *Moore v. Adams*, 8 Ohio, 373.

3. Complainant claims that she executed the mortgage to save her son from a criminal prosecution and from imprisonment. This is compounding a felony, and she has no standing in

[1] See *Brown v. Circuit Judge*, 75 Mich. 274, for a review of our system of chancery jurisprudence.

court; citing *Haynes v. Rudd*, 83 N. Y. 251, 102 Id. 372; *Sharp v. Wright*, 35 Barb. 236.

4. Giving the second mortgage, and complainant's subsequent conduct, were a ratification of her acts, and she cannot now repudiate them; citing *Gates v. Shutts*, 7 Mich. 127; *Lumber Co. v. Bates*, 31 Id. 158; *Dunks v. Fuller*, 32 Id. 242; *Haldane v. Sweet*, 55 Id. 196.

CHAMPLIN, C. J.   Frances E. Meech filed her bill of complaint against Philo D. Beckwith to compel the delivery up and cancellation of two notes and mortgages, which she claims were procured from her under circumstances which amounted to duress, and which should also be declared void on grounds of public policy.

She alleges that she is the widow of Stephen H. Meech, who died several years ago; that she is 69 years of age, and is infirm from age; that her husband, at the time of his death, was the owner and seised of certain real estate, a portion of which constituted the family homestead; that she has been endowed in a part thereof during her life, and resides upon the same; that, aside from her interest in such lands, she has no means of support; that she has a son, named Marquis H. Meech, who is married, and resides with her upon the homestead. Complainant further charges that—

"On or about March 14, 1887, one Fred E. Lee, who, she is informed and believes, is the son-in-law of Philo D. Beckwith, who is named as mortgagee in each of the mortgages hereinafter mentioned, and another person, whose name she does not know, but who, she was told by the said Fred E. Lee, was a sheriff, came to her residence; that the said Lee represented to her that he came there as the agent of the said Philo D. Beckwith; that her son, Marquis H. Meech, had borrowed and procured of the said Philo D. Beckwith the sum of $2,000, to secure the payment of which he had given to said Beckwith a mortgage on his portion of the lands inherited as above stated; that said Lee further stated to her that, in order to procure such moneys, he, the said Marquis, had falsely represented to said Beckwith that the lands which he proposed to give as security for such sum were free and clear from all incumbrances; that, in order further to convince said

Beckwith that said lands were free and clear of incumbrance, he produced and exhibited and gave to said Beckwith an abstract of title to said lands from the firm of Dix & Wilkinson, abstractors of titles in said Berrien county, which abstract, as exhibited and given to the said Beckwith, did show that the said Marquis H. Meech had an unincumbered title to the lands mortgaged; but that the same was not a true abstract, nor such a one as had been furnished by the said title abstractors, but had been changed and mutilated by him, said Marquis, so as not to show several previous mortgages for large amounts upon the same premises; that said abstract had been so changed and mutilated by the said Marquis for the purpose of falsely obtaining such money, of the sum of $2,000, from the said Beckwith; and that by means of such false pretenses the said Beckwith had advanced him, the said Marquis, the said sum of $2,000, taking as security a mortgage on such lands, believing such representations to be true, and that the same were not incumbered, whereas in fact and in truth they were incumbered by mortgages previously given by the said Marquis to a large amount, and that the security of the said Philo D. Beckwith, by reason thereof, was comparatively worthless.

" Complainant further says that the said Lee further represented to her that by such proceeding and false pretenses her son, the said Marquis H. Meech, had committed a criminal offense punishable by imprisonment in the State prison; and that, unless she would join in a mortgage of her lands to said Beckwith to secure the payment of such sum as the said Beckwith would have to advance to pay off such prior incumbrances on the lands of said Marquis, the said Beckwith would cause her said son to be prosecuted for such offense.   Complainant says that she was very reluctant to mortgage her lands for such or any purpose, and at first refused so to do; that the said Lee then told her the sheriff was there with him with the papers all ready to arrest said Marquis; that he, the said Lee, and the person whom he said was a sheriff, remained until long after dark.   And complainant says that the wife of the said Marquis was then living with your oratrix, and was sick and about to be delivered of a child, and had been informed of the trouble, and was suffering and crying bitterly.

" And complainant says that finally, and at a late hour in the evening of the said 14th of March, 1887, she reluctantly signed a mortgage of her lands to the said Philo D. Beckwith, wherein and whereby she was 'made to agree to pay to the said Beckwith, 30 days after such date, the sum of $1,700, with interest at 8 per cent. per annum, and signed also a note for such sum payable to said Beckwith 30 days after date, such lands being described in such mortgage as follows:

" 'The same being in Bainbridge, Berrien county, Michigan, and

known as subdivision No. 1, of the estate of Stephen H. Meech; beginning at north-west corner of section twenty-six, town four south, range seventeen west; thence south forty chains; thence easterly along the center of highway five and 1-100 chains; thence north thirty minutes and 95-100 chains; thence west five and 1-100 chains to place of beginning—20 2-100 acres. Also, lot two (2) in subdivision of said estate aforesaid. And also, lot eight (8) in subdivision aforesaid of said estate.'

"And reference was made in said mortgage for a more particular description to the record of said subdivision of said estate, recorded in Liber 3, Miscellaneous Records, p. 249, register's office, Berrien county, Michigan. Such mortgage purported to be duly executed, and was delivered to the said Lee, as agent for the said Beckwith, and was afterwards recorded in the office of the register of deeds of Berrien county, Mich., March 15, 1887, in Liber 40 of Mortgages, on page 9.

"Complainant further says that on or about the 24th day of March, 1887, the said Lee, as agent for the said Beckwith, again came to her residence, and stated that since the execution of the said mortgage dated March 14, 1887, the said Beckwith had discovered that the sum which he was compelled to pay to redeem the prior incumbrances on the said mortgaged lands of said Marquis was much greater than $1,700, and amounted to the sum of $2,440, or thereabouts, and insisted that the complainant should make another or new mortgage for such sum of $2,440; and again the said Lee threatened this complainant that, unless she would give such mortgage, the said Beckwith would immediately cause the arrest of said Marquis, but that, if she would sign the same, the said offense of said Marquis would be condoned, and no prosecution had.

"Complainant says that at the time she was sick, and nearly worn out with trouble and nursing of her sick daughter-in-law, and that under such threats and coercion she did join in another mortgage on March 24, 1887, to the said Philo D. Beckwith, for the sum of $2,440, to be paid on or before ten years from date, with interest at 8 per cent. per annum, payable annually; the lands embraced in said mortgage being described as follows:

"'All those pieces or parcels of land situate in Bainbridge, Berrien county, Michigan, to wit, lots one, two, three, four, and five, in the subdivision of part of the north-west quarter of section twenty-six, town four south, range seventeen west, made by commissioners in partition of the estate of Stephen H. Meech, deceased; beginning at the north-west corner of section twenty-six aforesaid; thence running south along section line forty chains; thence eastward along the center of highway 35 91-100 chains; thence north thirty-nine and 64-100 chains to the north line of said section; thence west along the north line of said section to the place of beginning,—one hundred and forty-three acres of land, more or less. Also, lots seven and eight of the subdivision of part of the south-east quarter of section twenty-five, in town four south, range seventeen west, made by the commissioners in said estate, and de-

scribed as all that part of the east one-half of said south-east quarter lying south of the highway, and containing forty-one acres of land more or less.'

"Such mortgage purports to be properly executed by your oratrix, and was taken by the said Lee, and delivered to the said Beckwith, as your oratrix is informed and believes, and was subsequently recorded in the office of the register of deeds, Berrien county, Mich., April 5, 1887, in Liber 36 of Mortgages, page 377. And your oratrix further says that she never received any consideration whatever for the giving of either of the above-named mortgages, and that she had no reason for giving either of them other than as she has stated. Complainant further says and charges that she only signed such mortgages and the notes accompanying the same through fear and duress, and was unduly harassed and over-persuaded into making the same; and that for such reasons, each of said mortgages, so far as she is concerned, or is a party thereto, is a fraud upon her rights, and is void. And she further says that the only consideration for such mortgages, or either of them, so far as she is concerned, was an agreement on the part of said Beckwith that if she would make the same he would not prosecute the said Marquis, her son, for the said alleged offense. And complainant says that such agreement or promise was and is contrary to public policy and unlawful, and that for such reason also said mortgages are each void.

"And your oratrix says that the said Beckwith, well knowing the premises, notwithstanding insists that your oratrix shall pay him the sum named, and asserts that he has full right to collect the same, and to sell the lands of your oratrix, embraced in such mortgages, under foreclosure."

The answer to the bill was made by the defendant, Philo D. Beckwith, in his life-time, wherein—

"He admits that the complainant is the widow of the late Stephen H. Meech, deceased, and that she is the mother of Marquis H. Meech, and that complainant was and became seised and possessed of part of the lands of which her husband died seised as his widow, to wit, some 76 acres was duly assigned to her, which embraced the buildings upon the farm, and being the same lands described in the bill of complaint. The defendant further admits that the said Marquis H. Meech was and is the owner of certain lands, to wit, 106 acres of land in the township of Bainbridge, Berrien county, and which his father, Stephen H. Meech, owned at the time of his death, and of which the said Marquis H. Meech became such owner, in part by inheritance from his father, and in part by purchase subsequent to the death of his father from the other heirs, and as owner he went into and still is in possession of the same.

"And this defendant, further answering, says that on or about the 31st day of March, 1884, the said Marquis H. Meech came to this defendant in the city of Dowagiac to obtain a loan of $2,000, and, in order to secure the repayment of the same with interest, proposed to mortgage to this defendant certain real estate in Bainbridge township, Berrien county, Mich., to wit, certain premises containing 106 acres of land, and embraced in his mortgage to this defendant,—as by the said mortgage, ready to be produced as this court shall direct, or the record thereof, duly recorded with the register of deeds for the county of Berrien, will more fully appear, —representing to this defendant that the said 106 acres of land was improved and valuable land, and that on the same was a good dwelling-house with a good barn and other outbuildings, and that said premises were free and clear from all liens and incumbrances whatsoever; and at the same time he exhibited to this defendant an abstract of said premises showing that he had an unincumbered title to said real estate.

"That this defendant, in full reliance upon the representations of said Marquis H. Meech, and the corrcetness of the abstract so exhibited to him, loaned him the said sum of $2,000, and thereupon the said Marquis H. Meech executed his promissory note for the said $2,000, and at the same time executed and delivered to this defendant a mortgage upon the said premises to secure the repayment of the said loan of $2,000, with interest at 8 per cent. per annum, evidenced by said promissory note, within five years from the date of said promissory note and mortgage; that the said Marquis paid the first year's interest as agreed in said note, but failed to pay the second year's interest, and after the same had been due a long while and on or about the 1st day of February, 1887, this defendant, on making inquiries as to the character of said security, learned for the first time that there were no buildings upon said premises, and the land was worth about $3,000, and that the same was not free and clear from all liens and incumbrances, but, on the contrary, said premises were, at the time of obtaining said loan of this defendant, largely incumbered with mortgages, one to Rufus P. Barnard, one to Freedom Shepard, and one to John S. Edwards. This defendant was informed that said several mortgages were due, and the principal sum of the several mortgages amounted in the aggregate to $1,700. This defendant further says that the said Marquis H. Meech had mutilated the said abstract of title of said premises, made by Dix & Wilkinson, abstractors of Berrien county, by cutting off that part of said abstract that showed that these several mortgages were still unpaid and undischarged, and then exhibited the said abstract as showing that the said Marquis was possessed of an unincumbered title to said premises.

"This defendant further says that he was informed by said Dix & Wilkinson that the said several mortgages amounted in the aggregate to some $1,700, the amount they were given. originally to secure, and that the mortgages must be looked after; that thereupon defendant sent Fred E. Lee to see the said Marquis H. Meech in reference to them, and the defendant is informed, and believes and states the fact to be, that the said Fred E. Lee, with Roscoe D. Dix, went to the house of said Marquis H. Meech, and had an interview with him about said mortgages, on or about the 14th day of March, 1887; that Marquis H. Meech and the complainant were and are living together as one family; that during the interview it was finally arranged and mutually agreed that if this defendant would advance the money, and pay off these several mortgages, the said Marquis and this complainant would give him a mortgage for the amount so advanced them as hereinafter stated; that the said Marquis H. Meech and the complainant were to execute a mortgage upon the said premises; that is, the said Marquis H. Meech was to execute a mortgage upon all his interest in said 106 acres, and also on his interest of an undivided one-third interest in all the remaining lands of which his father died seised, and in which his mother, the complainant, was entitled to a life-estate.

"And the complainant proposed, and agreed on her part, in consideration of the said Marquis H. Meech deeding and conveying to her all his interest in said 106 acres, and also all his one-third interest in and to the said balance of said real estate, to wit, the said 76 acres, to secure her, to join with her said son, Marquis, in the said mortgage to this defendant. It was further arranged that this defendant, for the repayment of the money that he should advance to take up these several mortgages, would wait ten years, with interest to be paid annually; and, the true amount of said mortgage not being known, it was finally agreed as a temporary and preliminary arrangement that a mortgage for $1,700, the principal sum of said several mortgages upon said mentioned premises, together with a note for $1,700, due thirty days from date, be made by said complainant with her son, Marquis H. Meech, together with Mary E. Clifton and Milton Meech, running to this defendant, and should be left with Roscoe D. Dix, and within thirty days he should ascertain the true amount due upon said several mortgages, and then a new mortgage, with a new note running ten years from date, with interest at 8 per cent. per annum, payable annually, should be made and executed in place of the $1,700 mortgage by the said complainant and Marquis H. Meech, together with said Mary E. Clifton and Milton Meech. In pursuance of this arrangement the said mortgage of the said $1,700, together with the said

note, was then executed. Afterwards the said Roscoe D. Dix, having ascertained the actual amount due to the said mortgagees on the respective mortgages, thereupon called upon complainant and the said Marquis H. Meech at their residence upon the premises in Bainbridge, and on the 24th day of March, 1887, in accordance with said arrangement, made out the mortgage of $2,440, and the same was executed by the complainant and Marquis H. Meech and his wife, and was also signed by Mary E. Clifton, but was not executed by the said Milton Meech, he declining to join in this mortgage. This mortgage not only embraced the lands of complainant, as mentioned in her bill of complaint, but the lands of Marquis H. Meech and his interest in the said first-mentioned premises, as well as the interest of Mary E. Clifton therein. * * * * * * *

"And this defendant further says, as he is informed and believes, and therefore states the truth to be, that thereupon, and on the same day, to wit, the 24th day of March, 1887, the said Marquis H. Meech, with his wife, and as a part of the same transaction, made, executed, and delivered a deed of all of his interest and estate in his lands hereinbefore mentioned to the complainant, to secure her for giving the said mortgage upon her said lands, as by such indenture of deed of conveyance, which this defendant avers to be in the possession and under the control of the said complainant, will fully appear, and prays may be produced as this court shall direct, or by the record thereof, duly recorded in the office of the register of deeds of Berrien county, will, on reference, appear.

"This defendant, further answering, says that in pursuance of the said arrangement and agreement, and in full execution thereof of said mortgage and the note for $2,440, this defendant paid the several mortgages, as by the receipts of which payment now in the possession of this defendant, and ready to be produced and proven as this court shall direct, may more fully appear; and said several mortgages were duly discharged of record, as by the said several discharges of mortgages now in the possession of this defendant, and ready to be produced as this court shall direct, or the records thereof duly recorded in the office of the register of deeds of the said county of Berrien, will fully appear.

"This defendant, further answering, says that the said mortgage was made, executed, and delivered to this defendant solely to fulfill and carry out the arrangements and agreements made between this defendant and complainant and the said Marquis H. Meech, as aforesaid, and the defendant paid the said several mortgages in full reliance upon the said mortgage, and that the same was executed and delivered to the defendant solely to carry into effect the agreement with the defendant as aforesaid.

"This defendant, further answering, says that complainant freely offered to execute to this defendant the said mortgage with her son, Marquis, on his deeding and conveying to her his real estate as aforesaid, and to secure this defendant for advancing the money needed to pay and satisfy the said several mortgages as aforesaid.

"And this defendant expressly and absolutely denies that the said Fred E. Lee ever held out any threat, promise, or persuasion, or practiced any improper circumstances whatever, to induce the complainant to execute said mortgage of $1,700, or the mortgage of $2,440.

"And he expressly and absolutely denies that the said Fred E. Lee ever threatened the complainant that if she did not join in said mortgage made March 14, 1887, and the mortgage made March 24, 1887, or either of them, this defendant would cause the arrest of Marquis for his misrepresentation in obtaining the loan of $2,000 as aforesaid.

"And he expressly denies that said Lee told complainant that the sheriff was in attendance ready to arrest the said Marquis on her refusing to join in said mortgage; and this defendant expressly and absolutely denies that the complainant refused to sign either of said mortgages, or signed them, or either of them, with any reluctance whatever; but, on the contrary, this is true, as the defendant is informed and believes, that the representations of Marquis to this defendant were talked over in her presence with Marquis. She had a full understanding of the mortgages being on the land prior to the defendant's mortgage, and the arrangement and agreement hereinbefore stated was talked over fully, and adopted to carry it into effect.    *    *    *    *    *    *    *

"And the defendant does fully, entirely, and absolutely deny that the execution of said mortgage on the 24th day of March, 1887, was obtained by or through means of any fraud or any threat or other improper practice of any nature or kind whatever."

When Stephen H. Meech died he left four children, his heirs at law, consisting of three sons and one daughter. One son died after the father's decease, and those living at the time of the acts narrated were Milton Meech, Marquis H. Meech, and Mary E. Clifton, all married. There had been a partition of all the property except the homestead of 56 acres, and 20 acres in which the son who died had purchased the interest of the other heirs. On

his death it descended to his mother, two brothers, and one sister in equal shares, and it was this 76 acres which was set out to the widow as her dower. The portion set off to Marquis H. Meech was described and was designated in the partition proceedings as lots 3, 4, 5, and 7, containing in the aggregate 107 8-100 acres, and is referred to in the testimony as the 107-acre tract, and this was the land which he had mortgaged to Beckwith and other parties.

The testimony was taken in open court before the circuit judge. And, in passing, it is well here to state that during the taking of the testimony objection was made to certain questions, and the testimony called for was rejected by the circuit judge, and does not appear in the printed record. This was wrong. The circuit judge, in cases of this character, has no authority to absolutely reject testimony, unless it is of a nature so scandalous as not to be proper to appear in the record of the proceedings. He cannot reject testimony upon the objection that it is irrelevant and immaterial. He may rule upon it, but the testimony must be taken and returned, and this for the reason that the Supreme Court is in equity an appellate court, and has a right to pass upon all the testimony, as well as upon the rulings of the circuit judge. If testimony is forced into a case which is evidently irrelevant and immaterial, a motion may be made to expunge it, and the court may order it expunged with costs against the solicitor insisting upon its being taken; but it must be returned to this Court, in order that we may pass upon the correctness of the ruling. Some testimony, as appears upon this record, was excluded which was evidently a part of the *res gestæ*, but sufficient remains to enable us to determine the issues involved upon their merits.

Some facts are proved by the testimony of the wit-

nesses for both parties, and may be considered as admitted. They may be summarized as follows:

1. Marquis H. Meech had obtained $2,000 from Beckwith by false pretenses.

2. Beckwith had made a criminal complaint before Henry Michael, a justice of the peace, against Marquis H. for the crime of obtaining money by false pretenses, and a warrant was issued by the justice for his arrest, and delivered to Beckwith. The complaint was drawn by the prosecuting attorney, and was made on the 14th of March, 1887, and the warrant was issued that day.

3. Mrs. Frances E. Meech was not indebted to Beckwith, and had no part in obtaining the money from him, and knew nothing of the fraud practiced upon him.

4. She had a dower and homestead interest in certain lands, and also an undivided one-fourth interest in 20 acres more, which was her own property.

5. She was the mother of Marquis H. Meech, and was induced by some person or persons, and by some means, to execute a mortgage upon all her interest in the lands mentioned, to secure the payment of $2,440 indebtedness which she did not owe, and was under no legal obligation to pay.

6. The two Lees, Dix, and Chase, the deputy-sheriff, went to Mrs. Meech on March 14, 1887, to settle up the matter of the prior mortgages, and, in case it could not be settled, to arrest Marquis H., and prosecute him for the offense; they were armed with a warrant for his arrest.

7. The warrant has never been returned, nor the criminal offense prosecuted.

The disputed questions of fact are, whether the parties who represented Mr. Beckwith's interests made any threats or statements as to the arrest of Marquis H., or of sending him to prison, before the notes and mortgages were executed.

Counsel for defendants seems to think that if no threatening language was used to complainant, or in her hearing, the case of complainant is not made out. And in addition to the denial of the two Lees and Dix, and the total want of memory of Chase, the deputy-sheriff, who did no talking, and had nothing to do but listen, defend-

ants have introduced several impeaching witnesses who
testify that the reputation of the whole Meech family for
truth and veracity is bad, and that they should not want
to believe them under oath. The testimony of the im-
peaching witnesses, when sifted, is entitled to no weight;
and the denial of defendants' witnesses was in conflict
with the natural sequence of the facts, about which there
is no dispute, above narrated, unless they went there
with the preconceived design and understanding that if
they could obtain this security without actually making
threats of arrest it would be valid, and it is quite pos-
sible that there was such an understanding.

The transaction of the 14th, when the first, or prelim-
inary, mortgage for $1,700 was given, and that of the
24th, when the $2,440 mortgage was executed, were in
fact one transaction, having one object in view. Mr. Dix
admits that on the night of the 14th, after the $1,700
mortgage was executed, and after the other parties had
left, he stayed there a half an hour, perhaps, and it was
then brought up, and discussed by Mrs. Meech, Mrs.
Clifton, and himself; that it was a very hard thing,—
what a loss it might be to them in case they could not
sell. He consoled them by telling them—

"We all had experiences of that kind, or most all. Of
course it was a good deal better to settle it up in this
way than to have trouble otherwise."

And he also says, upon his cross-examination, that in
this conversation he told Mrs. Meech that it was a crim-
inal offense, and that Chase, who was there during the
day, was the sheriff. The pertinency of the remark that
"it was better to settle it up this way than to have
trouble otherwise" is plain to be seen. It cannot be
denied that these facts were brought home to Mrs. Meech
before she executed the second mortgage, and must have
influenced her to do so.

It is claimed by the solicitor for complainant that the facts and circumstances which occurred upon the 14th of March, by which complainant was induced to execute a note and mortgage for $1,700, show that she was induced thereto by a sort of duress, and it was not her voluntary act; and that such influence continued, and was the inducing influence of her executing the mortgage and note for $2,440.

Courts of equity grant relief in many cases where there is no legal duress in the strict acceptation of the term, and where the wronged party would perhaps be remediless at the common law. Thus it is said:

" Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will, and preventing any true consent, equity may relieve against the transaction on the ground of undue influence, though there may be no invalidity at law." 2 Pom. Eq. Jur. § 951.

So, it is laid down by Mr. Justice Story that when a person—

" Does an act, or makes a contract, when he is under duress or the influence of extreme terror or of threats, or of apprehension short of duress," he may be relieved in equity; "for in cases of this sort he has no free will, but stands *in vinculis*, and the constant rule in equity is that where a party is not a free agent, and is not equal to protecting himself, the court will protect him. * * * Circumstances also of extreme necessity and distress of the party, although not accompanied by any direct restraint or duress, may in like manner so entirely overcome his free agency as *to justify the court in setting* aside a contract made by him on account of some oppression or fraudulent advantage or imposition attendant upon it." 1 Story, Eq. Jur. § 239.

*Harris v. Carmody,* 131 Mass. 51, was a case where a son had forged his father's name to promissory notes, as indorser. The holder sued the father, and before the

suit terminated the father settled the suit, and gave his note for $1,000, secured by a mortgage on real estate. The wife of the mortgagor paid interest on the note and mortgage twice, and once in the presence of her husband. She testified she paid it for her son. The mortgage was foreclosed, and proceedings taken to dispossess the mortgagor and his wife, and he set up as a defense that the note and mortgage were obtained by duress. The evidence tended to show that he was induced to sign the mortgage by threats of the prosecution and imprisonment of his son. Mr. Justice Morton, after referring to authorities, said:

"The exception in favor of husband and wife is not based solely upon the legal fiction that they are in law one person, but rather upon the nearness and tenderness of the relation. The substantial reasons for the exception apply as strongly to the case of a parent and child as to that of a husband and wife. No more powerful and constraining force can be brought to bear upon a man to overcome his will, and extort from him an obligation, than threats of great injury to his child. Both upon reason and upon the weight of the authorities we are of opinion that a parent may void his obligation by duress to his child, and therefore that the ruling of the superior court upon this point was correct."

*Foley v. Greene*, 14 R. I. 618, was a case very much like this. In that case the court said:

"It is true, there was no direct threat by Hanley, but there was a pressure exerted which had the effect, and was doubtless intended to have the effect, of a threat."

And in that case the court quotes at length from the case of *Bayley v. Williams*, 4 Giff. 638, in which case the note and security were given by a father to protect his son from criminal prosecution for forgery of his father's name to certain promissory notes. At page 659 the court says:

"If the fair result of the evidence shows that the

agreements were executed under influence felt by the plaintiff, and exercised by the defendants, if the fear of the criminal prosecution against the plaintiff's son, or if the result of the discovery of a criminal act, for which the plaintiff was not liable, was used by the defendants against the plaintiff, to operate upon his fears so as to induce him to give a security which would relieve his son from a criminal prosecution, according to the law of this court a security obtained under such circumstances cannot stand. The inequality in the situation of the parties, the one exacting a security which the other is driven to give in order to save his son from exposure, disgrace, and ruin, taints the security obtained under the influence of such fears. If the main and influencing purpose was the relief of the son from the consequences of his crime, if this was the main consideration operating on the father's mind, and was the origin and real cause of the transaction, the intervention of other circumstances, or other collateral advantages to the father, will not be enough to justify the court in upholding such a security."

The case reported in 4 Giff. 638, was appealed to the house of lords, and is reported in L. R. 1 H. L. 200 (*Williams v. Bayley*). Separate opinions were given by the lord chancellor and by Lords Chelmsford and Westbury, and the decree or order was affirmed, and the bill dismissed. The opinions pronounced in that case are quite applicable to the case at bar. See, also, the case of *Coffman v. Bank,* 5 Lea, 232.

The case under consideration may be considered from two points of view:

1. Was the complainant a free and voluntary agent, or did she give the security in question under undue pressure exerted by the emissaries of the defendant?

2. Was the transaction, taken independently of the question of undue influence, an illegal one, as being contrary to the rules and settled principles of law?

In considering the first point, it is pertinent to ascertain what was the basis of the transaction or negotiations between Beckwith, acting through his agents, and the

82 MICH.—19.

complainant, that led to the giving of the securities in question, and what was the motive or inducement that was brought to bear on the complainant in order to induce her to give the securities. It is not claimed that she was liable for the debt of her son in any manner, but the negotiations were conducted throughout upon the basis that her son had committed a serious offense and was liable to criminal prosecution. This is apparent from the testimony of witnesses for defendants, not only from what was said, but from the whole conduct of the parties who obtained the securities. It is idle to say that Mrs. Meech did not understand that her son stood in jeopardy of being arrested for the mutilation of the abstract and obtaining the money thereby. The language used was a menace, as stated by defendants'. witnesses. And that Mrs. Meech was greatly agitated and wrought upon, so that in her mental distress she shed tears, is also proven by their testimony. The prospect was presented to her of her son's disgrace, and the danger of his being taken from her home, leaving her without help or assistance, with his wife in the critical condition described. By the testimony there were four men there, three of them urging a settlement, and the giving of security by this aged mother for her son, one of them playing the part of the mysterious stranger. What was the settlement they were urging? What had she to settle? Is there any doubt that in her mind and understanding she was settling the serious offense her son had committed, to save him from prosecution? Was that not the object of the parties who went there for that purpose? They admit they had a warrant for her son's arrest with them, and a sheriff to serve it; and they admit the arrest would have been made had not the settlement been effected. What, then, was the motive which

induced the mother to mortgage all she possessed to this party to whom she did not owe one cent? The only motive to induce her to do so was the hope that by so doing she would relieve her son from the inevitable consequences of his crime.

The question is whether, when under such circumstances, about which there is no dispute, a mother is appealed to to take upon herself an obligation of paying $2,440, with the knowledge that unless she does her son will be exposed to a criminal prosecution, with the certainty of conviction, it can be regarded as her free and voluntary act. I have no hesitation in saying that it cannot. She stated to these men that she did not want to do it; that she ought not to do it at her time of life; and it is plain that she was brought into the situation of either refusing, and leaving her son to his perilous condition, or of taking on herself, at the age of nearly three score years and ten, the burden of this, to her, unjust debt.

The second mortgage was made under the like restraint, and after she was fully aware of the perilous situation of her son. Mr. Justice Story says:

"If the party is still acting under the pressure of the original transaction, or the original necessity, or if he is still under the influence of the original transaction, and of the delusive opinion that it is valid and binding upon him, then, and under such circumstances, courts of equity will hold him not barred from relief by any such confirmation." 1 Story, Eq. Jur. § 345.

This was the case with Mrs. Meech, and the second mortgage is affected by the original transaction.

The fact of a deed from the son to his mother of his incumbered property does not render the transaction valid. She has asserted no rights under such deed, and there is no evidence that it was delivered to her. The evidence is that Mr. Dix took the deed and left it for record at the same time he did the second mortgage, and

says that was the understanding that he should do so. So far as the relief sought by this suit, it does not concern defendants where the legal title to the 107 acres is. Whether it can be considered as held by Mrs. Meech in trust, to support the mortgage given by Marcus H. Meech, is not involved in this litigation.

The other question remains to be considered. It appears that there was a criminal complaint made, and that the purpose was to prosecute if no settlement was made. They obtained the security, and the warrant never was returned to the justice. Mr. Dix told Mrs. Meech that it was better to settle it in this way than to have any trouble otherwise. The inference is plain. The object of the settlement was to stifle the criminal proceedings; such was the result of the settlement. As was said by Lord Westbury in *Williams v. Bayley,* cited above,—

"They knew well, for they had before them the confessing criminal, that forgeries had been committed by the son; and they converted that fact into a source of benefit to themselves, by getting the security of the father. Now that [you shall not make a trade of a felony] is the principle of the law, and the policy of the law, and it is dictated by the highest considerations. If men were permitted to trade upon the knowledge of a crime, and to convert their privity to that crime into an occasion of advantage, no doubt a great legal and a great moral offense would be committed."

It is only necessary to insert in this quotation, in the place of "forgeries," the crime for which Meech was charged, and in the place of "father," the word "mother," to make it entirely applicable to the case under consideration. Such transactions are against public policy, and a contract growing out of them is voidable.

The counsel for defendants insists that, if the claim be true that complainant executed the mortgages to save her son from a criminal prosecution, she was compounding

a felony, and has no standing in court. But this rule does not apply in all cases. The distinction is pointed out in 1 Story's Equity Jurisprudence in section 298, where the learned author says:

"In general, for it is not universally true, where parties are concerned in illegal agreements or other transactions, whether they are *mala prohibita* or *mala in se*, courts of equity, following the rule of law as to participators in a common crime, will not at present interpose to grant any relief, acting upon the known maxim, '*In pari delicto potior est conditio defendentis et possidentis.*' But in cases where the agreements or other transactions are repudiated on account of their being against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not, in equity, material. The reason is that the public interest requires that relief should be given, and it is given to the public through the party."

So it is laid down in 2 Pomeroy's Equity Jurisprudence, in section 941, that—

"Even where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him. In pursuance of this principle, and in compliance with the demands of a high public policy, equity *may* aid a party equally guilty with his opponent, not only by canceling and ordering the surrender of an executory agreement, but even by setting aside an executed contract, conveyance, or transfer, and decreeing the recovery back of money paid, or property delivered, in performance of the agreement."

He also says, in section 942, that—

"When the contract is illegal, so that both parties are to some extent involved in the illegality, in some degree affected by the unlawful taint, but are not *in pari delicto*, that is, both have not with the same knowledge, willingness, and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy, a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more

innocent, and may grant him full affirmative relief by canceling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered, as the circumstances of the case shall require, and sometimes even by sustaining a suit brought to enforce the contract itself, or, if this be impossible, by permitting him to recover the amount justly due, by means of an appropriate action not directly based upon the contract."

I think the mortgages and notes should all be set aside, and held for naught, as against the lands and interest in lands belonging to the complainant, and described in her bill of complaint, and such lands be declared free and clear from any and all liens created by said mortgages, and the notes must be declared invalid, and be surrendered up to be canceled. The circuit court held the note and mortgage given March 14, 1887, invalid, and the note and mortgage of March 24 valid. The decree will be affirmed as to the note and mortgage of March 14, and reversed as to the note and mortgage of March 24, 1887, and a new decree will be entered here declaring both notes and both mortgages void in accordance with this opinion.

I do not, in anything I have said in reaching this conclusion, cast any imputation upon the character of these gentlemen who obtained these mortgages. Nor do I find it necessary to decide upon any conflict of testimony. If the complainant's testimony is given full credit, she is entitled to the relief prayed, and, if the testimony of the defendants is considered in connection with the undisputed facts, the complainant's case is made out. They may have believed that they were acting for the best interests of all concerned, but an honest and disinterested application of the principles of the law will not allow the securities obtained under the circumstances these were to stand.

The other Justices concurred.